UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————

DONALD W. PIERSONS, JR.,

                        **Plaintiff,**

                                                            **Civ. Action No.**
   vs.                                                        **3:06-CV-0408 (TJM/DEP)**

**QUALITY ARCHERY DESIGNS, INC.,**
*et al.*,

                        **Defendants,**
———————————————————————

**THOMAS J. McAVOY,**
**Senior United States District Judge**


## DECISION & ORDER

Pursuant to the parties' application for construction of certain terms of Plaintiff's United States Patent No. 6,044,832 (the "'832 Patent"), the matter was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Markman Hearing.[1] After conducting the Markman Hearing, Magistrate Judge Peebles issued a Report and Recommendation recommending specific constructions of the disputed terms. See Rep. & Rec. pp. 42-44 [dkt. # 209]. The Plaintiff and the "Cooper John Defendants"[2] filed

---

[1] A Markman Hearing refers to a pre-trial proceeding to determine the construction of disputed claim terms. It traces its origin to the Federal Circuit's *en banc* decision in Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir.1995), aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed.2d 577 (1996), in which the Federal Circuit held that interpretation of a claim, as the first of a two-step process for determining patent infringement, is a question of law for the court.

[2] As indicated by Magistrate Judge Peebles, numerous defendants in this action, including the Cooper John Corp., are represented by the same counsel and referred to collectively as the "Cooper John Defendants." See Rep. & Rec. pp. 8-9.

1

objections to certain of the recommended constructions.  See Plt. Obj. [dkt. # 212]; Cooper John Def. Obj. [dkt. # 211].

When a party objects to a magistrate judge's report and recommendation, the Court reviews *de novo* those portions of the findings or recommendations to which specific objections are made. See 28 U.S.C. § 636(b)(1); see Pina-Urena v. U.S., 2008 WL 542597, at * 3 (S.D.N.Y. Feb. 29, 2008)("Those parts of the R & R to which specific objections are made must be reviewed de novo. . . .  However, those sections of the R & R to which general and conclusory objections are made are reviewed strictly for clear error.")(citations omitted).   After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].  The [Court] may also receive further evidence or recommit the matter to the magistrate [judge] with instructions." 28 U.S.C. § 636(b)(1).

Having reviewed the objections and considered the specific objections *de novo*, the Court has determined to adopt the constructions recommended by Magistrate Judge Peebles with two exceptions.

Plaintiff objects to Magistrate Judge Peebles's recommended construction of the term "bracket subassembly."  Magistrate Judge Peebles recommended that the term be constructed to mean: "An assembled unit, comprised of a bracket into which a high/low stop point pin is mounted, designed to be incorporated with other units into a finished product." Rep. & Rec. p. 43.  In reaching this construction, Magistrate Judge Peebles observed that "it appears that the phrase 'bracket subassembly' was intended by the inventor to include within it two or more components." Id. at p. 24.

Plaintiff  takes no issue with the observation that the bracket subassembly involves

2

two or more components, but objects to the magistrate judge's conclusion that "[t]he only additional element referenced with regard to the bracket subassembly is a 'high/low stop point pin'." Id. (citing '832 Patent, col. 5, lns. 35-37). Plaintiff contends that there are other elements of the bracket subassembly mentioned in column 5, lines 35-43 of the '832 Patent, including a screw to "clamp[] the arrow rest subassembly to bracket" and a bolt to "join[] bracket to the overdraw assembly through slot in bracket." Plt. Obj. p. 3. Plaintiff argues:

> Since claim 1, section a, states that the "bracket subassembly [is] mounted on said bow frame or said optionally equipped overdraw assembly", it seems more logical to interpret the bolt as the second element in the bracket subassembly, since the functionality of joining the bracket to the bow is set forth in the claim itself. However, there is no need to draw additional limitations into the claims by identifying a specific second element.

Id.

While the '832 Patent provides at Column 5, lines 35-36 that "[t]he bracket subassembly *comprises* a bracket into which a high/low stop point pin is mounted" (thereby supporting the conclusion that the bracket subassembly *consists of* a bracket and a high/low stop point pin), the remaining portion of the preferred embodiment supports the argument that the "bracket subassembly" includes more than a bracket and a high/low stop point pin. Inasmuch as "claim terms ordinarily should not be construed in such a way with reference to the preferred embodiment [] to the exclusion of broader definitions which could have been intended by the inventor," Rep. & Rec. p. 24 (citing Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1303 (Fed. Cir. 2007)); see also Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*en banc*) (cautioning against importing limitations from the specification into the claims), the Court agrees that the term should not

3

be limited by the high/low stop point pin as its second and only other element. Accordingly, the Court construes the term "bracket subassembly" to mean: "An assembled unit, comprised at a minimum of a bracket into which a high/low stop point pin is mounted, designed to be incorporated with other units into a finished product."

Plaintiff also objects to Magistrate Judge Peebles's construction of the term "synchronously" to mean "simultaneously." Rep. & Rec. p. 43; Plt Obj., pp. 4-5. The term "synchronously" is used in claim 1(b) where it is indicated that the arrow rest assembly comprises "(b) an arrow rest subassembly rotatable about an axis synchronously with the movement of said tuning cable as said bow is drawn and released . . . ." In recommending a construction for the term synchronously, Magistrate Judge Peebles addressed the competing arguments that the term required the various parts to move precisely at the same time (as advocated by a defendant), or in a step-by-step, causal fashion (as advocated by Plaintiff). In reaching his conclusion as to the meaning of the term, Magistrate Judge Peebles wrote:

> Having carefully reviewed the '832 specification and patent history, in light of the parties' submissions, I find no basis to conclude that absolute precision in the specified movement is a critical element of the patented invention. Instead, I find that the term signifies two separate movements which are interrelated and occurring in step, or in phase, though not necessary with the precision advocated by [Defendant] PSE. Accordingly, I will define "synchronously" to mean "simultaneously", so that the phrase "[rotatable] about an axis synchronously with the movement of said tuning cable as said bow is drawn and released" should be defined to mean that "the arrow rest subassembly rotates simultaneously with the movement of the tuning cables as the bow string is drawn and as the bow string is released."

Rep. & Rec. pp. 27-28.[3]

---

[3] The interchange of "synchronously" with "simultaneously" was based upon Magistrate Judge
(continued...)

4

In objecting, Plaintiff renews his argument as to the temporal and causal relationship of the movements of the various parts of the device, arguing that the specifications clearly indicate that the arrow rest subassembly does not rotate about the axis until the bow string is within about 2-4 inches of full draw. Plt. Obj. p. 5.  Thus, Plaintiff contends, "[t]he movements of the axis is *synchronized* with the movement of the tuning cables but both actions are clearly not occurring *simultaneously*." Id. (emphasis in original)

The objection, as stated, does little to advance the issue or provide clarity such to avoid future disputes.  Because the definition of synchronized includes simultaneous,[4] and because simultaneous could mean "occurring at the same time,"[5] or "exactly coincident,"[6] Plaintiff's objection - which seemingly asks the Court to leave the term synchronously in claim 1(b) without further construction - does not resolve the dispute.  Based on a review of the disputed term in the context of the claims, the patent specifications, and the prosecution history, the Court and, as is apparent, Magistrate Judge Peebles, agree with Plaintiff - at least with regard to the temporal and causal relationship of the movement of

---

[3](...continued)
Peebles's review of various dictionaries' definitions of "synchronous" which defined the word as meaning, *inter alia*, simultaneous. Rep. & Rec. p. 27.

[4]See Merriam-Webster OnLine, http://www.merriam-webster.com/dictionary/synchronized (accessed 3/11/08); Webster's Online Dictionary, http://www.websters-online-dictionary.org/definition/synchronize (accessed 3/11/08).

[5] Webster's Online Dictionary, http://www.websters-online-dictionary.org/definition/simultaneous (accessed 3/11/08).

[6]Merriam-Webster OnLine, http://www.merriam-webster.com/dictionary/simultaneous (accessed 3/11/08).

the various parts. See Phillips, 415 F.3d at 1312-23 (reaffirming the Vitronics[7] line of cases emphasizing the primacy of the specification in patent claim construction); Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term ... in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention").  Viewing this evidence through the lens of one of ordinary skill in the art, the Court construes the term "synchronously" to mean "to cause to occur at approximately the same successive instants of time so that the movements are coordinated."  See Oxford English Dictionary;[8] see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1351  (Fed. Cir. 2004) (proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record").

The Court has considered the other stated objections to Magistrate Judge Peebles's recommended term constructions and finds them to be without merit.  Except

---

[7] Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir.1996).

[8] The online version of the Oxford English Dictionary provides the following definitions of "synchronize," the root word of "synchronously":

> v. 1. . . . b. trans. To cause to be, or represent as, synchronous; . . . ; to bring together events, etc. belonging to the same time. . . . 2. a. intr. To occur at the same successive instants of time; to keep time with; . . . ; to have coincident periods, as two sets of movements or vibrations. [2] b. trans. To cause to go at the same rate . . . . [2] c. In technical senses: to cause to coincide in time; to operate simultaneously or in synchronization. 3. gen. To combine or co-ordinate."

http://dictionary.oed.com/cgi/entry/50245279?single=1&query_type=word&queryword=synchronize+&first=1&max_to_show=10 (accessed 3/11/08).

for the two terms discussed above, the Court adopts Magistrate Judge Peebles's recommended term constructions for the reasons stated in his Report and Recommendation [dkt. # 209].[9]

**THEREFORE**, it is hereby **ORDERED** that the following meanings are affixed to the following disputed terms:

| Terms | Construction |
|---|---|
| Preamble | States a necessary and defining aspect of the invention, rather than being simply an introduction to the general field of the claim |
| Bracket Subassembly | An assembled unit, comprised at a minimum of a bracket into which a high/low stop point pin is mounted, designed to be incorporated with other units into a finished product |
| Arrow Rest Subassembly | An assembled unit, comprised at a minimum of an arrow holder/guide and an axle, designed to be incorporated with other units into a finished product |
| Synchronously | To cause to occur at approximately the same successive instants of time so that the movements are coordinated |
| Internally Mounted Spring | The tension spring at issue is located within a housing designed to protect it from outside influences, including the elements |
| Arrow/Holder Guide | No construction necessary |
| Pivotally Mounted | The arrow rest subassembly is mounted to the bracket subassembly in such a manner that it can pivot relative to the bracket subassembly |
| Relatively Inelastic | The actuator cord is inelastic to a degree comparable with the inelasticity of a NYLON® cord measuring 0.125 |

---

[9]The term "synchronicity" as used in Magistrate Judge Peebles's construction of the term "Relatively Inelastic" and adopted here shall have the same temporal and causal meaning as the term "synchronously".

|                              |                                                                                                                                                                                                   |
| ---------------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                              | inches in diameter, such that it directly transfers movement of the tuning cable to the arrow rest subassembly in a manner which results in the synchronicity of that movement                    |
| Attached                     | No construction necessary                                                                                                                                                                         |
| About 2-4 Inches             | Approximately the value as state                                                                                                                                                                  |
| Bent Backwards At an Angle   | The end tabs initially extend forward from the arrow rest subassembly (*i.e.*, away from the bowstring), and then bend back toward the arrow rest subassembly (*i.e.*, toward the bowstring)      |
| Between About 30º and 60º    | Between approximately the values as stated                                                                                                                                                        |

**IT IS SO ORDERED**

DATED: March 12, 2008

*/s/ Thomas J. McAvoy*
Thomas J. McAvoy
Senior, U.S. District Judge