**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DONALD W. PIERSONS, JR.,**

                                        **Plaintiff,**

                                                            **Civ. Action No.**
        **vs.**                                          **3:06-CV-0408 (TJM/DEP)**

**QUALITY ARCHERY DESIGNS, INC.,**
***et al.,***

                                        **Defendants,**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                              **DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff Donald W. Piersons, Jr. ("Plaintiff") commenced this action asserting, *inter alia,* that the Defendants infringed his United States Patent No. 6,044,832 (the "'832 Patent"). See Compl. [dkt. # 1].  Presently before the Court is Defendant Cabela's Incorporated's ("Cabela's") motion for partial summary judgment contending that Claims 1 - 3 of the '832 Patent are invalid on the grounds that the patent fails to met the definiteness requirement of paragraph 2 of 35 U.S.C. § 112.  See Cabela's Mot. S.J. [dkt. # 139].  The following defendants have joined in Cabela's motion:  TR Outdoors Archery Experts LLC [dkt. # 152]; Eder, Inc. [dkt. # 158]; Precision Shooting Equipment, Inc. [dkt. #

1

159]; and the Cooper John Defendants[1] [dkt. # 164].  The Cooper John Defendants have

moved independently for partial summary judgment, contending that all three claims of the

'832 Patent violate paragraphs 1 and 2 of 35 U.S.C. § 112 because "(1) the claims

misdescribe what the inventor regarded as his invention and (2) the specification does not

enable one of skill in the art to make and use the invention (mis)described in the claims."

Cooper John Def. Mem. L. p. 2 [dkt. # 156].  The following defendants have joined in the

Cooper John Defendants' motion:  TR Outdoors Archery Experts LLC [dkt. # 161] and

Precision Shooting Equipment, Inc. [dkt. # 163].  Plaintiff has opposed the motions and

cross-moved for partial summary judgment seeking to dismiss Defendants' affirmative

defenses of invalidity and to obtain a declaration that the '832 Patent is valid because "the

Defendants have failed to identify clear and convincing evidence sufficient to prove that

any claim of the '832 Patent is invalid for indefiniteness under 35 U.S.C. §112 or is

anticipated or obvious in view of any prior art under 35 U.S.C. §§102 and 103." Pl. Mem.

L. in Opp. to Sum. Jud. and in Supp. of Cross-Mot.,  p. 1 [dkt. # 182].

## II.   BACKGROUND

Plaintiff Donald Piersons is the inventor and current owner of the patent-in-suit,

U.S. Patent 6,044,832 ('832 Patent).  The '832 Patent,  entitled "Fall Away Arrow Rest

Assembly,"  discloses a "drop-away" or "fall away" arrow rest assembly 40[2] for a

---

[1]The following defendants are represented by the same counsel and are referred to collectively as the "Cooper John Defendants": Copper John Corporation, Bass Pro Outdoors Online, LLC, Bass Pro Outdoors World, LLC, Cobra Manufacturing Co., Inc., Gander Mountain Company, Golden Key - Futura Inc., H.H. and A. Sports, Inc., Hunter's Friend LLC, Inventive Technology, John Schaffer Performance Archery Products, Inc., Lancaster Archery Supply, Inc., Quality Archery Designs, Inc., Ripcord Technologies Inc.

[2]The numbers referenced in the text are from the '832 Patent and correspond with the numbers referenced in the figures from the '832 Patent which are reproduced in the Appendix.

2

compound bow.  A compound bow includes an upwardly acting tuning cable 7, a downwardly acting tuning cable 8, and a bow string 9.  Simply stated, the inventive device acts as follows.  Prior to drawing the bow, the arrow 10 is held in position by a holder/guide 14.  As a hunter draws the arrow 10, an actuator cord 30 attached to an arrow rest assembly 40 and the downward acting cable 8 begins to become taut.  A spring 19 internally mounted within the arrow rest assembly resists this movement.  As the bow 1 is drawn, the downwardly acting tuning cable 8 moves downwardly and rearwardly pulling the first end of the actuator cord 30 downwardly and rearwardly.  When the bow 1 is within about 2-4 inches of full draw, the actuator cord 30 becomes taut and overcomes the tension in spring 19.  This begins to rotate axle rod 15, thereby causing holder/guide 14 to rotate upwardly.  As holder/guide 14 rotates upwardly, arrow 10 is automatically centered in the "vee" of the holder/guide 14.  After the hunter releases the arrow and after the arrow has traveled forward about 2-4 inches, the actuator cord 30 becomes slack. This slackening of the actuator cord 30 permits the internal spring 16 to function, thereby resulting in the rapid downwardly rotation of the holder/guide 14 with consequent loss of contact with the arrow 10 shaft.  The arrow 10, having already built sufficient forward momentum, continues on its forwardly trajectory despite the falling away of the arrow rest.

In his application for the patent, Plaintiff originally filed claims 1-5, with claims 1 and 4 as follows (portions of claim 1 not relevant to the pending motions omitted):

1. An arrow rest assembly for use with a compound bow . . .

> c) **an actuator cord attached to said arrow rest subassembly and said downwardly acting tuning cable** which, when said bowstring is drawn in a direction away from said frame to within about 2-4 inches of full draw position, becomes taut and, overcoming the tension in said spring,

3

> rotates said holder/guide of said arrow rest subassembly
> upward to lift and align an arrow in firing position, and which,
> when said bowstring is released, becomes slack, thereby
> allowing the tension in said spring to function causing said
> holder/guide of said arrow rest subassembly to rapidly fall away
> from contact with said arrow.
>
> . . .
>
> 4.  An arrow rest according to claim 1 wherein **said actuator cord is
> prepared from a strong, flexible, but relatively inelastic, material**.

Cabela's Exh. B, Application as filed, p. 12-13 (emphasis added).

The U.S. Patent and Trademark Office ("PTO") rejected both claims 1 and 4 as

anticipated by Pittman, U.S. Patent 5,365,912.  Cabela's Exh. C, First Office Action, p. 2.

In a First Amendment, Plaintiff amended claim 1 by inserting the subject matter of claim 4

into claim 1 and canceling claim 4.  In other words, Plaintiff amended claim 1 to recite that

the actuator cord is "prepared from a strong, flexible, but relatively inelastic, material."

Cabela's Exh. D, First Amendment, p. 2.  Plaintiff contends he did this to more completely

describe and specify the characteristics of the "actuator cord" which were not disclosed in

nor anticipated by Pittman's '912 patent. Plaintiff notes that the original Patent Application

dated 8/10/1998 stated: "Cord 30 may consist of any strong, relatively inelastic material

which is sufficiently flexible to be run from screw 17 and looped around tuning cable 8.  I

have found a NYLON® cord of about 0.125" diameter to be especially effective.  A cord

prepared of a highly elastic material such as rubber, has not been found to function well

because of its counteraction to the spring." Cabela's Exh. B  p. 9, lines 11-15.

In an Office Action dated June 7, 1999, the PTO rejected the amended claim 1 as

obvious over Pittman in view of Savage, U.S. Patent 5,490,492, Cabela's Exh. E, Second

Office Action, p. 2-3.  The Patent Office asserted that:

4

Pittman shows the cord in two parts:  an elastic segment 46, and a non-elastic segment 48 (column 4, lines 37-41). (Although Pittman indicates that the segment 48 is "nonflexible", the drawings show segment 48 flexible; presumably this should be "nonelastic").  However, it is not clear why an elastic segment would be necessary; it appears that the invention would work properly with a single nonelastic segment.  For example, Savage shows that in a bow with tuning cables passing through a slide on a cable guard, and a pivotal arrow rest, the position of the arrow rest may be controlled with a nonelastic cord 54 between the arrow rest and cables; this single-segment cord would be easier to manufacture than the double segment cord of Pittman.  It would have been obvious to one of ordinary skill in the art to use a single nonelastic cord with the arrow rest of Pittman, as suggested by Savage.

Id. at p. 3.

Plaintiff responded to the rejection by amending claim 1 to include further subject matter (not directly related to the "relative elasticity" of the actuator cord).  Cabela's Exh. F, Second Amendment, p. 1.  Plaintiff argued that Pittman utilized a two part actuator cord, viz., a flexible rubber tubing attached to a non-flexible cable, and again asserted that he "explicitly cautions against the use of highly elastic materials, specifically warning against the use of rubber." Id., at p. 2.  He further noted that the "sole characteristic noted by Savage is a 'flexible' line 54 . . . .  Stated in another way, Savage does not expressly characterize his line 54 as being either elastic or non-elastic." Id. at p.2.  The PTO then allowed the claims and issued the '832 Patent.  Cabela's Exh. G, Notice of Allowability.

The claims of the '832 Patent provide as follows:

1.  An arrow rest assembly for use with a compound bow, said bow comprising a frame, optionally equipped with an overdraw assembly, having a cable guide bar extending therefrom, a bow string having an upwardly acting tuning cable and a downwardly acting tuning cable which are attached to a cable slide slidably mounted on said cable guide bar, said assembly comprising:

(a)  a bracket subassembly mounted on said bow frame or on said optionally equipped overdraw assembly;

5

(b)  an arrow rest subassembly rotatable about an axis
synchronously with the movement of said tuning cables as said
bow is drawn and released which contains an internally
mounted spring and carries an arrow holder/guide, said
subassembly being pivotally mounted to said bracket
subassembly; and

(c)  an actuator cord prepared from a strong, flexible, but
relatively inelastic, material attached to said arrow rest
subassembly and said downwardly acting tuning cable which,
when said bowstring is drawn in a direction away from said
frame to within about [2-4][3] inches of full draw position,
becomes taunt and, overcoming the tension in said spring,
rotates said holder/guide of said arrow rest subassembly
upward to lift and align an arrow in firing position, and which,
when said bowstring is released, becomes slack, thereby
allowing said arrow to slide along said holder/guide for about
2-4 inches before allowing the tension in said spring to function
causing said holder/guide of said arrow rest subassembly to
rapidly fall away from contact with said arrow.

2.  An arrow rest assembly according to claim 1 wherein said holder/guide has a
truncated, fork-shaped structure comprised of a pair of prongs having end tabs that
are bent backwards at an angle.

3.   An arrow rest assembly according to claim 2 wherein said end tabs are
bent backward at an angle between about 30º-60º.

'832 Patent, col. 7, line 20 - col. 8, line 28.

## III.    STANDARD OF REVIEW

The standard for summary judgment in a patent case is the same as in any other

case. See Desper Products, Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1332 (Fed. Cir.

1998); Union Carbide Corp. v. American Can Co., 724 F. 2d 1567, 1571 (Fed. Cir. 1984).

Summary judgment is proper where there is no genuine issue of material fact and the

---

[3]The '832 Patent filed with the Court, dkt. #6, reads "about 24 inches," but Plaintiff contends that its
was corrected to  read "about 2-4 inches" pursuant to Certificate of Correction filed with the USPTO.  There
appears to be no dispute in this regard.

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c ); <u>Kegel Co., Inc. v. AMF Bowling, Inc.</u>, 127 F.3d 1420, 1425 (Fed. Cir. 1997).  Of course, on a motion for summary judgment the party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive  issue and its entitlement to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-movant. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  A party opposing summary judgment may not simply rest on denials in its pleadings, but has the burden of demonstrating either the existence of a genuine dispute of material fact, <u>id.</u> at 586-587, or that the movant is not entitled to judgment as a matter of law.

## IV.    PATENT VALIDITY

An issued U.S. patent is entitled to a statutory presumption of validity.  35 U.S.C. § 282.  The defendants bear the burden of proving invalidity by clear and convincing evidence.  <u>Datamize, LLC v. Plumtree Software, LLC</u>, 417 F.3d 1342, 1347-48 (Fed. Cir. 2005);  <u>Applied Materials Inc. v. Advanced Semiconductor Materials Am., Inc.</u>, 98 F.3d 1563, 1569 (Fed. Cir. 1996).

## V.    DISCUSSION

### a.    Cabela's Motion

As asserted in Cabela's Memorandum of Law:

The subject of this Motion is Cabela's contention that the claims of this patent are indefinite because it is impossible to determine how to conduct

7

oneself and stay clear of the claims of the patent. In particular, patent claim 1 calls for an actuator cord prepared from "a strong, flexible, but <u>relatively inelastic</u> material." Neither the patent itself nor its application file history provide a guide for the scope of what materials are considered "relatively elastic." Any definition for this term can only be arbitrarily selected. Accordingly, claim 1 fails to particularly point out and distinctly claim the subject matter of the invention, as required by the patent statute, 35 U.S.C. §112, ¶2.

Cabela's Mem. L. p. 1 (emphasis in original).

The requirement of claim definiteness set out in § 112 assures that claims in a patent are "sufficiently precise to permit a potential competitor to determine whether or not he is infringing." <u>Amgen Inc. v. Hoechst Marion Roussel, Inc.</u>, 314 F.3d 1313, 1342 (Fed. Cir. 2003); <u>see</u> 35 U.S.C. § 112.[4]  As the Federal Circuit recently explained, "[b]ecause claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, <i>i.e.</i>, what subject matter is covered by the exclusive rights of the patent. Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." <u>Halliburton Energy Services, Inc. v. M-I LLC</u>,  514 F.3d 1244, 1249 (Fed. Cir. 2008) (citing <u>Athletic Alternatives, Inc. v. Prince Mfg., Inc.</u>, 73 F.3d 1573, 1581 (Fed.

---

[4]Section 112 provides in pertinent part:

**§ 112.  Specification**

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112.

Cir. 1996) ("[T]he primary purpose of the requirement is to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights.")).

However,

[t]he definiteness requirement . . .  does not compel absolute clarity. Only claims not amenable to construction or insolubly ambiguous are indefinite. Thus, the definiteness of claim terms depends on whether those terms can be given any reasonable meaning. Furthermore, a difficult issue of claim construction does not *ipso facto* result in a holding of indefiniteness. If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. . . . By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of validity and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal..

Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 75 U.S.P.Q.2d 1801, 1804-05 (Fed. Cir. 2005)(internal citations and quotation marks omitted).  Thus, a claim will be deemed invalid for indefiniteness only "where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area."  Halliburton,  514 F.3d at 1249-50.  "[D]etermination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  Exxon Research and Engineering Co. v. U.S., 265 F.3d 1371, 1376 (Fed. Cir. 2001).

Here, the Court must determine whether the cited claim language calling for "an actuator cord prepared from a strong, flexible, but relatively inelastic, material," together with the specification and prosecution history, would allow a person of ordinary skill in the

9

art to discern the boundaries of claim 1.  See Halliburton,  514 F.3d at 1249 ("The

common thread in all of these cases is that claims were held indefinite only where a

person of ordinary skill in the art could not determine the bounds of the claims, *i.e.*, the

claims were insolubly ambiguous.");  Ortho-McNeil Pharm. Corp. v. Caraco Pharm. Labs.,

Ltd., 476 F.3d 1321, 1326 (Fed. Cir. 2007) ("When interpreting claims, we inquire into how

a person of ordinary skill in the art would have understood the claim terms at the time of

the invention.  A person of ordinary skill in the art is deemed to have read the claim term

in the context of the entire patent, including the other claims, the specification and the

prosecution history.")(citations and internal quotation marks omitted).

> The Court agrees with Magistrate Judge Peebles that
>
> a person of ordinary skill in the art, though possessing no particular
> specialized education, is someone who has developed a working familiarity
> with the design, mechanics and maintenance of compound bows and arrow
> rests, developed either through education, experience, or hunting, or a
> combination of those, with at least a handyman level of mechanical sense
> and capability of constructing or repairing compound bows and their
> components, including arrow rests.

Id. at p. 17.   Moreover, the Court agrees with Magistrate Judge Peebles that "[t]he use of

the word 'relatively' in the '832 Patent does not necessarily render the patent hopelessly

invalid, nor does it necessarily signify an ambiguity which eludes construction."  Id. p. 33

(citing Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1342 (Fed. Cir. 2003)

("[A] claim is not indefinite merely because its scope is not ascertainable from the face of

the claims . . . [r]ather, a claim is indefinite . . . if it is insolubly ambiguous, and no

narrowing construction can properly be reached.") (internal quotations omitted)).

> The meaning of qualifying words or phrases such as "relatively" hinges on
> the technological particulars of the patent in issue. See Ortho-McNeil Pharm.
> Corp. v. Caraco Pharm. Labs., Ltd., 476 F.3d 1321, 1326 (Fed. Cir.

10

2007)(construing the term "about"). Thus, when a claim incorporates a word of degree it is essential to discern whether the specification provides any standard for measuring that degree. <u>Seattle Box Co., Inc. v. Industrial Crating & Packing, Inc.</u>, 731 F.2d 818, 826 (Fed. Cir. 1984). The Federal Circuit further has observed that the use of such words

> avoids a strict numerical boundary to the specified parameter. Its range must be interpreted in its technological and stylistic context. We thus consider how the term . . . was used in the patent specification, the prosecution history, and other claims. It is appropriate to consider the effects of varying that parameter, for the inventor's intended meaning is relevant. Extrinsic evidence of meaning and usage in the art may be helpful in determining the criticality of the parameter . . . .

<u>Ortho-McNeil</u>, 476 F.3d at 1326 (citations omitted).

Rep. & Rec. pp. 33-34.

More difficult, however, is determining whether the term "strong, flexible, but relatively inelastic, material" as used in connection with the actuator cord would lead a person skilled in the art, when viewing the claims of the '832 Patent in context, to discern the scope of the patent.

The '832 Patent clearly describes an apparatus whereby an actuator cord is connected between a tuning cable and an arrow holder assembly. The '832 Patent further clearly describes the actions that cause the invention to function - namely, the actuator cord becomes taut 2-4 inches from full draw thereby overcoming the tension of the spring and lifting the arrow holder. When the bow string is released, the actuator cord become slack releasing tension on the spring which, in turn, forces the arrow hold to drop away from the arrow's shaft. Thus, the relative inelasticity of the actuator cord is essential to the functioning of the invention.

The '832 Patent describes the material and properties for the actuator cord as

follows:

> The cord 30 may consist of any strong, relatively inelastic material which is
> sufficiently flexible to be run from screw 17 and looped around tuning cable
> 8.  I have found a NYLON® cord of about 0.125" diameter to be especially
> effective.  A cord prepared of a highly elastic material such as rubber, has
> not been found to function well because of its counteraction to the spring.

'832 Patent , col. 6, lines 3-8.  This description provides some degree of specificity as to

what type of material would function properly in the device described in the '832 Patent.

See 3/12/08 Decision and Order, pp. 7-8 [dkt. # 217](adopting Magistrate Judge Peebles's

construction of the term "relatively inelastic" in claim 1 to mean that "[t]he actuator cord is

inelastic to a degree comparable with the inelasticity of a NYLON® cord measuring 0.125

inches in diameter, such that it directly transfers movement of the tuning cable to the

arrow rest subassembly in a manner which results in the synchronicity of that

movement.").  While neither the term used in the '832 Patent nor as construed by the

Court gives a precise definition of  "relatively inelastic," such precision is not required. See

Halliburton,  514 F.3d at 1249-50; Ortho-McNeil, 476 F.3d at 1326; Datamize 75

U.S.P.Q.2d at 1804-05.  What is required is that a person of ordinary skill in the art,

employing his or her knowledge in the field and upon reviewing the claim language, the

specification, and the prosecution history, could determine the bounds of the claims.  The

Court finds that one skilled in the art could determine the bounds of the claims.

     In this regard, one skilled in the art could arrive at an understanding of the contours

and range of "an actuator cord prepared from a strong, flexible, but relatively inelastic,

material" by examining a NYLON® cord of about 0.125" diameter and reviewing the

entirety of the claims, the specification, and the prosecution history of the '836 patent.

Upon such a review, a person of such skill could reasonably determine that a flexible cord

having similar elastic properties to that of a NYLON® cord of about 0.125" diameter and that, when pulled to its full length, presents enough tension to overcome the resistence of the spring mounted within the arrow rest assembly thereby causing the arrow holder to rotate upwardly, is the type of actuator cord covered by the invention.  A cord having more elasticity than a NYLON® cord of about 0.125" diameter and that would not create enough tension to overcome the spring and lift the arrow holder when extended to its full length would fall outside the scope of the claims of the '832 Patent.  See Rep. & Rec. p. 38 ("[W]hile something as elastic as a rubberband could ostensibly be considered for use of the patent invention, someone of ordinary skill in the art would readily reject such a material as not providing the requisite synchronicity.").  Similarly, based upon the specification and the prosecution history, a person skilled in the art could reasonably conclude that an inflexible actuator cord, or one with no elasticity, would fall outside the bounds of the claims.

While the task of discerning the bounds of the claims is formidable and could result in conclusions over which reasonable persons could disagree, Defendants have not established by clear and convincing evidence that a person of ordinary skill in the art would *not* be able to discern the scope of claim 1 with enough precision to avoid infringement.  When applying the statutory presumption of validity, the conclusion is even more compelling.  Accordingly, Cabela's motion is denied. Also denied are the motions of the defendants that joined Cabela's motion on the same grounds.

### b.    Copper John Defendants' Motion

The Copper John Defendants argue that "the patent fails to comply with the

13

requirements of 35 U.S.C. § 112, first paragraph and second paragraph, because (1) the

claims misdescribe what the inventor regarded as his invention and (2) the specification

does not enable one of skill in the art to make and use the invention (mis)described in the

claims." Cooper John Def. Mem L., p. 2.   In this regard, the Cooper John Defendants

contend:

> All three claims violate 35 U.S.C. § 112 because each of the claims
> effectively includes the language "an arrow rest subassembly…which
> contains an internally mounted spring and carries an arrow holder/guide,
> said subassembly being pivotally mounted to said bracket subassembly".
> Contrary to the foregoing language of the claims, the description of the
> invention in the '832 Patent consistently dictates that the arrow rest
> subassembly is locked within, and is not pivotally mounted to, the bracket
> subassembly.  Thus, the claims misdescribe the disclosed invention and are
> directed to something other than what the inventor "regards as his
> invention."  Additionally, because of this flawed language that misdescribes
> the purported invention, the claims are directed to an inoperative device, and
> therefore the '832 Patent violates another aspect of § 112, because the
> inventor did not "enable any person skilled in the art…to make and use" the
> (inoperative) claimed invention.  Thus, the '832 Patent is invalid, and any
> attempt to contort the claim language to avoid either of these two violations
> of § 112 would violate the requirement of § 112 prescribing that the
> specification of the patent conclude "with one or more claims particularly
> pointing out and distinctly claiming the subject matter" of the patented
> invention.

Id. p. 4.

Plaintiff all but ignores this argument in his Memorandum of Law in Opposition to

Summary Judgment, contending only that the terms "arrow rest subassembly" and

"bracket subassembly" are adequately defined in the '832 Patent. See Pl. Mem L. pp. 9-

11.[5]  In his opposing Statement of Material Facts, however, Plaintiff asserts that:

---

[5]At pages 9 - 10 of his Memorandum of Law, Plaintiff addresses the Cooper John Defendants'
argument relative to the definiteness of the claim in light of the term relatively inelastic actuator cord.  At
pages 10 -11, he appears to address the Cooper John Defendants' argument set forth in their independently

(continued...)

One skilled in this art clearly recognizes that the arrow rest subassembly maintains its ability to function pivotally by means of bushing/housing 20 which is locked into position on the bracket subassembly by setscrew 25. Bushing/housing 20 is specified as a component of the arrow rest subassembly, and is the means by which the arrow rest subassembly and the bracket subassembly are joined to create a functioning arrow rest assembly.  The '832 Patent specification does not state, nor imply, that locking set screw 25 renders the arrow rest subassembly inoperable.

Pl. L.R. 7.1(a)(3) Stat., Resp. to Cooper John Def. 7.1(a)(3) Stat., ¶ 13.

The Court agrees that '832 Patent in not rendered invalid by the specification.

While the specification provides numerous references from which it could be concluded

that the "arrow rest subassembly" and "bracket subassembly" are locked together in such

a manner that there is no movement of either, see '832 Patent column 3, lines 31-36;[6] id.

---

[5](...continued)
filed motion referenced in the text.  In this regard, Plaintiff argues:

> Copper John states that "the prosecution history of the '832 Patent before the United States Patent and Trademark Office,…. provides no guidance as the meaning of either of the terms 'arrow rest subassembly' or 'bracket subassembly'".  They add that "one is left to glean the meaning [of these terms] from a reading of the '832 Patent."  Copper John asserts that the terms "arrow rest subassembly" and "bracket subassembly" are not widely employed in the field of archery equipment.  However, it is not essential that these terms be widely recognized in order for Plaintiff to have employed them in describing his invention. At col. 5, lines 44-65 of the '832 Patent, Plaintiff clearly states that the "arrow rest subassembly" consists of an arrow holder/guide, a cylindrical axle rod, a spring, set screws and a bushing/housing 20.  At col. 5, lines 35-38, the "bracket subassembly" is defined as consisting of a bracket, a high/low stop point pin and a screw, identified by numeral 25, "which supplies the means for clamping the arrow rest subassembly to bracket 24"  (note also the exploded view of Fig. 3 of the '832 Patent).  The fact that these terms may not have widespread usage in the art of archery equipment is of no consequence, since Plaintiff has defined the component parts of each term in the specification sufficiently to enable one skilled in the art to make and use the claimed arrow rest.

> The Patent Examiner did not find that these terms raised an impediment to patentability for failure to comply with either or both the first and second paragraphs of 35 U.S.C. §112, as alleged by Defendants.  The fact that these terms never raised an issue during prosecution of the patent application defeats Defendants' contention that any of these terms create "fatally flawed claim language".

[6]"The inventive assembly comprises an arrow rest and a bracket that is mounted to an overdraw or directly to the riser of a compound bow.  The arrow rest portion of the assembly is inserted into the bracket, aligned horizontally, and **then affixed into place**.  The arrow rest is internally spring loaded downward."

(continued...)

15

at column 5, lines 37-39;[7] id., column 6, lines 16-23;[8] id., column 6, lines 51-54,[9] the

patent, read as a whole, would lead a person of reasonable skill in the art to conclude that

the arrow rest subassembly and bracket subassembly are connected using a bushing that

allows for the pivotal or rotating movement of the arrow rest subassembly.  Indeed, the

Court has construed the term "Pivotally Mounted" to mean that "[t]he arrow rest

subassembly is mounted to the bracket subassembly in such a manner that it can pivot

relative to the bracket subassembly."   3/12/08 Decision and Order, p. 7.

Accordingly, the Cooper John Defendants' motion is denied. Also denied are the

motions of the defendants that joined the Cooper John Defendants' motion on the same

grounds.

### c.      Plaintiff's Cross-Motion

Plaintiff cross-moves for partial summary judgment seeking to dismiss Defendants'

affirmative defenses of invalidity and to obtain a declaration that the '832 Patent is valid

because "the Defendants have failed to identify clear and convincing evidence sufficient to

prove that any claim of the '832 Patent is invalid for indefiniteness under 35 U.S.C. §112

or is anticipated or obvious in view of any prior art under 35 U.S.C. §§102 and 103." Pl.

---

[6](...continued)
(Emphasis added).

[7]"Screw 25 supplies the means **for clamping the arrow rest subassembly to bracket 24**. . . "
(Emphasis added).

[8]"After placing the inventive arrow rest subassembly into the bracket subassembly, the actuating
positioning of the arrow rest subassembly is adjusted by first rotating the rest until the holder/guide 14 . . .
Thereafter, the arrow rest subassembly is adjusted horizontally **and locked into position** by setscrew 25."
(Emphasis added).

[9]"Such vertical [(fine tuning)] adjustments are carried out with spring 19 under tension and the arrow
rest subassembly **affixed in the bracket subassembly** by set screw 25." (Emphasis added).

Mem. L. in Opp. to Sum. Jud. and in Supp. of Cross-Mot.,  p. 1.  The lion's share of the

cross-motion is devoted to Plaintiff's contention that the claims of the '832 Patent are not

anticipated or obvious in view of prior art under 35 U.S.C. §§102 and 103.

When the cross-motion was filed, counsel for the Cooper John Defendants wrote to

the Court asking that the cross-motion not be entertained until after completion of

construction of the claims and any discovery that may be necessitated by the claim

construction. See Cooper John Def. Letter Mot., dkt. #184; Uniform Pre-trial Scheduling

Order, dkt. # 100 (allowing 4 months of discovery after the Court renders its decision on

the construction of contested claim terms).  While that motion was denied, see Endorsed

Order, dkt. # 197, it now appears that the better course is to afford additional time before

addressing the cross-motion.  Given the construction of numerous terms in the '832

Patent, Plaintiff's argument that his invention in not anticipated or obvious in view of prior

art, or the Defendants' opposition thereto, may take on a decidedly different complexion.

See Rep. & Rec. p. 36 ("[C]onstruction of the term 'relatively inelastic', as utilized within

the '832 Patent, to mean "non-elastic" or "inelastic", as advocated by defendants Trophy

Taker and Copper John, could render the '832 Patent invalid in light of the prior art.").   It

may well be that, given the Court's construction of the contested claim terms, the '832

Patent implicates prior art not addressed in Plaintiff's motion or explored by Defendants

through discovery.  It should also be noted that in response to Plaintiff's Statement of

Material Facts in support of his cross-motion, Defendants repeatedly responded that they

were unable to admit or deny a specific fact until the Court issued a decision on the

construction of various contested claim terms.

Accordingly, the Court finds that the most provident course is to deny the cross-

motion with leave to renew following the completion of discovery.  If Plaintiff is of the opinion that his present cross-motion is sufficient, he may simply resubmit it.  He may also, if he so desires, amend or refine the motion.  Defendants' response, of course, must await the motion.

## VI.    CONCLUSION

For the reasons set forth above, Cabela's Motion for Summary Judgment, dkt. # 139, and the motions by the following defendants that have joined in Cabela's motion:  TR Outdoors Archery Experts LLC, dkt. # 152; Eder, Inc., dkt. # 158; Precision Shooting Equipment, Inc., dkt. # 159; and the Cooper John Defendants, dkt. # 164, are **DENIED**.

 The Cooper John Defendants' Motion for Summary Judgment, dkt. # 156, and the motions of the following defendants that have joined in the Cooper John Defendants' motion:  TR Outdoors Archery Experts LLC, dkt. # 161, and Precision Shooting Equipment, Inc., dkt. # 163, are **DENIED**.

Plaintiff's Cross-Motion for Summary Judgment, dkt. # 182, is **DENIED WITH LEAVE TO RENEW.**

**IT IS SO ORDERED**.

DATED:  March 20, 2008

Thomas J. McAvoy
Senior, U.S. District Judge

**APPENDIX**





FIG.2A

FIG. 3

FIG.2

FIG. 2A

**U.S. Patent**          Apr. 4, 2000          Sheet 3 of 4          6,044,832

FIG.3



FIG.4A                                    FIG.4B





FIG. 5